## COCHECO MANUFACTURING CO. *v.* STRAFFORD.

On a petition to abate taxes assessed by the selectmen of a town, there is no right to a trial by jury, but the court in such case may, in its discretion, send an issue to the jury.

When the valuation of a water power is in question, it would ordinarily be a proper exercise of discretion to send the case to commissioners.

The owner of the land at the outlet of a lake or pond is the owner of the water power furnished by that stream, as an incident to the land, but he is not in consequence the owner of the bed of such lake or pond, or of the land on its borders, merely because he has flowed it for twenty years; and he is not liable to be taxed for either the bed of the lake, or the land so flowed on its borders.

Where the value of the water power furnished by such lake is greatly enhanced by a dam and excavations at the outlet, converting it into a reservoir for mills twenty miles below, the water power, with the land to which it is attached, is still real estate in the town where the outlet is situate, and is taxable there at its fair value, in its improved state, for any purpose for which it is or may be applied, even although such improvements were made by the owners of those mills, and for use there.

In the valuation of those mills for the purpose of taxation in another town, the increased value by reason of such reservoir should be considered,—diminished, however, by the cost of maintaining it, including the taxes assessed in the town where it is situate.

Real estate of corporations, as of individuals, is taxable only in the towns where it is situated.

51  455
66   75
51  455
67  443
67  520
68  588
68  470
51  455
70   22
70  149
70  150
70  203
70  207
51  455
71  156
71  158
71  476
51  455
72  565

The petition to abate a tax is an equitable proceeding, appealing to the discretion of the court, and the whole tax will not be abated because there was included in the assessment a small amount of property not liable to be assessed.

Section 4 of chapter 51 of the General Statutes, providing that every person liable to be taxed in any town shall exhibit to the selectmen an account of his polls and estate for which he is taxable there, does not apply to non-residents; and, therefore, an exhibition of such account is not necessary to entitle such non-resident to maintain a petition to abate his taxes.

PETITION, by Cocheco Manufacturing Company against the town of Strafford, to abate taxes, alleging that the petitioners own certain cotton mills and printery on the Cochecho river in Dover; that Bow pond is the source of one of the tributaries of that river, and is some twenty miles above their said mills; that the natural area of this pond is about 740 acres; that since 1825 the petitioners have used said pond as a reservoir for their mills at Dover; that by excavations at the outlet they can draw the water of this pond some eight feet below its natural low water mark, and by a dam there can raise it some twelve feet above the low water mark; that they have purchased and own lands bordering upon said pond, and which are all, or nearly all, flowed by said dam when full, the lands amounting to 130 acres and 44 rods, which is all they own in said Strafford; that the full cash value, at the relative value of other lands in Strafford, does not exceed $1000; that they also have bought the right to flow other lands in Strafford by their said dam to the amount of about 205 acres; that the selectmen of Strafford, in 1870, estimated the company's lands at 1000 acres in Strafford, and appraised the same at $40,000, and assessed that year against the company taxes to the amount of $936; and the plaintiffs aver that they are liable to be taxed in that town only for 130 acres and 44 rods of land at a valuation not exceeding $1000; that by written petition they have applied to the selectmen of said Strafford to abate said tax, which they have neglected and refused to do; and that they have complied with all the other requirements of the law,—and they ask that the taxes so assessed may be abated.

The answer alleges that the natural area of the pond is much more than 740 acres. It admits that since 1825 the plaintiffs have used this pond as a reservoir for their mills in Dover, and says that they have drawn water from this pond to supply their said mills one third part of the time each and every year.

The answer admits the excavations and raising of the dam as stated in the petition,—the purchase by the plaintiffs of certain lands bordering on said pond, and that some portion of the same, but not nearly all, are flowed during some portions of the year but not all the year, and that such lands amount to much more than $136\frac{44}{160}$ acres, to wit, 500 acres; that the lands are not all the lands the plaintiffs own in Straf-

ford, but that they own all the lands flowed by said pond at its natural height, in all, with the lands so purchased, more than 1000 acres, together with the right to flow other lands as alleged in the petition ;—and the defendants say that the plaintiffs own the fee in the 205 acres ; that they own the stone dam there, worth $30,000 ; that in 1870 the selectmen estimated the plaintiffs' lands in Strafford at 1000 acres about, but did not appraise them at $40,000, or assess a tax upon them of $936, but that they did estimate the real estate of the company, to wit, the land, dam, and pond, known as Bow pond reservoir, at $40,000, and upon the whole assessed said tax,—alleging that the plaintiffs are liable to be taxed for all the land covered by said pond at any stage of the water, and for said pond, or reservoir and dam, as well as for said lands purchased by them, amounting in all to $136\frac{44}{100}$ acres ; and the actual value of said land, dam, and pond is fully $100,000.

The answer admits the plaintiffs' application to the selectmen to abate the tax, but denies that they have complied with all or any other requirements of the law; that, although the selectmen appointed the house of Robert B. Peavey in said Strafford, and the 12th day of April, 1870, from ten o'clock A. M. to four o'clock P. M., as the place and time when they would receive an account of the polls and taxable property in Strafford, and gave due notice thereof by posting advertisements at the town-house and at the stores of George C. Peavey and Davis Foss & Son, on March 29, 1870, yet the plaintiffs did not then, or at any time, render any such account of their taxable property : and the answer alleges that the tax is legal and just.

The petitioners moved for the appointment of commissioners to report the facts, and the defendants moved for a trial by jury.

*Wheeler* (and *Goodrich* of Massachusetts), for the petitioners.

*Peavey* and *Small*, for the defendants.

BELLOWS, C. J.* The first question is, whether the parties have a right of trial by jury. By article twenty of our bill of rights, it is provided that in all controversies concerning property, and in all suits between two or more persons, except in cases in which it has heretofore otherwise been practised, the parties have a right to trial by jury. As to the first part of the provision, we have no doubt that under our decisions this proceeding must be regarded as a controversy concerning property within the meaning of this constitutional provision. *Petition of the Mount Washington Road Co.*, 35 N. H. 142.

The inquiry then is, whether matters of this sort, at the adoption of the constitution, were determined without a trial by jury ; and to answer that question, it is necessary to consider our early legislation on .the

---

* Smith, J., did not sit.

subject, as well as the nature of the power conferred upon the courts. The earliest authority for the abatement of taxes that we find was in 1719. Province Laws 1771, p. 138. By sec. 6 of that act, selectmen were authorized to assess taxes in their respective towns for such sums of money as may be voted therein, for the support of the ministry, schools, and the poor, and. for other necessary town charges, and to issue their warrants to the constables, who may make distress, &c., and for want of goods, &c., to seize and imprison the person of the delinquent tax-payer; " and if any person shall think himself overrated, and make it so appear to the selectmen, he shall be eased; and if they refuse, such person aggrieved may make his application to the quarter sessions, who are hereby empowered to rectify the same." The court of sessions had been previously constituted. See Province Laws 1771, p. 5, sec. 2. By that law the court of sessions was to be held quarterly at Portsmouth by justices of the peace, or so many as should be limited by their commissions to make a quorum, and it was to have cognizance of all matters and things proper to the jurisdiction of said court relating to the conservation of the peace, and the punishment of offenders according to the law and statutes in force within this province. By the same act jurisdiction was conferred upon justices of the peace to the amount of forty shillings. A court of common pleas was also established with a jurisdiction extending to twenty pounds, and a superior court with general jurisdiction in matters exceeding twenty pounds.

By the act of March 19, 1771, same Province Laws, p. 207, these courts are reëstablished with the same jurisdiction in general, and giving to the court of sessions the power to require money to be raised by taxation for sundry county purposes; to audit and allow accounts against the county, and generally to have charge of the county buildings and other property. By law of February 8, 1791, N. H. Laws, ed. 1805, p. 215, selectmen were authorized to abate taxes assessed by themselves or by their predecessors, if sufficient reason is shown; and if they refuse, the court of sessions, on application, may make such order as justice may require, but limiting it to cases of over valuation. The law of July 7, 1827, ed. Laws of 1830, p. 559, sec. 14, is substantially like that of February, 1791, except that the court of common pleas takes the place of the court of sessions, and it has the power to abate taxes assessed by way of doomage, for not giving an invoice when the person was unable to give it. By chapter 44 of the Revised Statutes, section 1, selectmen may, for good cause shown, abate any tax assessed by them or their predecessors; and by section 2, if selectmen refuse, the court of common pleas, on application, may make such order as justice may require. The General Statutes, ch. 53, secs. 10 and 11, are the same.

From this review of our legislation, it will be observed that no provision is anywhere made for a trial by jury; and this affords an inference that no such trial was contemplated, especially when it is considered that for a great many years there was no constitutional provision from which it could be urged that such a trial was a matter of right.

Upon the absence of any provision for a trial by jury in the assess-

ment of damages for lands taken for highways, much stress was laid by the court in *Backus* v. *Lebanon*, 11 N. H. 19, and in the *Petition of Mount Washington Road Co.*, 35 N. H. 134, and especially in the latter case.

In all these provisions the selectmen have power to abate taxes assessed by themselves or their predecessors for any good cause, and, among others, for inability to pay them—*Briggs's Petition*, 29 N. H. 547 ; and, of course, no trial by jury before this could have been contemplated. So, too, there is nothing in the character of the jurisdiction originally given to the court of sessions that would encourage the belief that a trial by jury before that court was contemplated. It was to have cognizance of all matters and things proper to the jurisdiction of that court relating to the conservation of the peace and the punishment of offences; and such seems to have been the jurisdiction of that court in England. 5 Burns's Justice 194. It seems, indeed, that indictments were then found by a grand jury, and trials had by a traverse jury, even in cases of felony, but it does not appear that it had jurisdiction of civil causes according to the course of the common law. So it appears to have been in the early history of our province, at the time the power to abate taxes was conferred upon it. Looking, then, at the nature of the power to be exercised, involving necessarily much exercise of discretion, and the tribunals to which it was entrusted, we should not be prepared to expect that the questions would be submitted to a jury. Nor are we able to learn of any instance of a trial by jury in such cases. Applications to the courts have not been numerous, and the reported cases are very few—only about half a dozen : in none of these, however, was there a trial by jury,—the facts having been determined by the court.

As the law now stands, the court has substantially the same power as the selectmen, and may abate taxes in whole or in part for inability in the tax-payer,—as in *Briggs's Petition*, 29 N. H. 547,—or on account of insanity. In some cases the court may make an equitable abatement, as in *Perry's Petition*, 16 N. H. 44 ; and generally the court may exercise the same discretion as the selectmen. Altogether, a large discretion is now lodged in the court, and so large as to be inconsistent with the idea of submitting the entire subject to a jury. Cases may however arise where it would be a proper exercise of discretion to send an issue to the jury, and we think the court would have power to do it,— as was held in *Baker* v. *Holderness*, 26 N. H. 110, in respect to a petition for an increase of damages to land, assessed by selectmen in laying out a highway. There is nothing in the law that prohibits the submitting of questions arising in such cases to a jury ; and, under the general power incident to courts of justice, we think they might do it when the nature of the case made it expedient.

In the case before us, the great question of fact is the value of the property taxed, consisting mainly of a water power; and, under the peculiar circumstances of the case, we think it would not be a sound exercise of discretion to send the question to a jury. In determining

the value of the property, there will be necessarily mingled with the matters of fact many questions of law, and it will be convenient to have the report of a competent board of commissioners, placing the whole subject before the court in a way to promote a speedy decision of the cause. Besides, the case is one that peculiarly calls for the selection of persons having knowledge of the value of such kind of property; and, upon the whole, we think it expedient to send the case to a board of commissioners, consisting of three persons, whose acquaintance with such subjects would enable them to form a reliable judgment.

The next question is, Upon what principles shall the value of the property for the purpose of taxation in Strafford be determined, and how far shall that value be affected by the circumstance that the water is used in connection with the mills of the petitioners in Dover? On this point the first inquiry is, What did the petitioners own in the town of Strafford that was subject to be taxed there? It seems that they owned a dam at the outlet of Bow pond, and a right to maintain it, and to raise the water above its natural height, and also to draw it down below the natural level, in dry times, by deepening the channel of the outlet. It appears that they owned certain lands around the margin of this pond, and the right to flow other lands there.

It seems that the property owned by them is valuable chiefly as a water power, and that the lands owned by them, together with the right of flowing other lands, are valuable chiefly as constituting part of the water power,—an essential part of the reservoir. If the plaintiffs own lands about the pond which are not flowed, or are useful and valuable for purposes other than constituting part of the reservoir, they should, of course, be appraised at their fair value; but so far as they constitute part of the water power merely, they will naturally be included in the general appraisal, and should not be separately appraised. It is true that it is possible that the water power may at some time be abandoned, and the pond drawn down so as to uncover the plaintiffs' lands and make them valuable for other purposes; but so long as the water power is the principal thing, the appraisal of that will include everything that goes to constitute part of it, and is valuable for nothing else.

With these views, it would seem to be unnecessary to consider whether the plaintiffs have title to the general bed of the pond, or whether they can be rightfully taxed for the right of flowing the lands of others, because we understand that the value of the plaintiffs' property is mainly, if not altogether, in the water power, and that it is likely to remain so.

In respect to land owned by the company in fee, it would seem that it might be the subject of a separate valuation and assessment, although it was used only for the purpose of flowing. *Boston Water Power Company* v. *City of Boston*, 9 Met. 199. But in such case the valuation should be made so as to avoid a double assessment; otherwise the excessive tax would be abated on a proper application. This would not, however, apply to the general bed of the pond, or land which the

plaintiffs had acquired the right to flow by twenty years' user. By purchasing the land at the outlet of the pond, the plaintiffs acquired the right, as incident to the land, to the use of the water flowing from the pond in its natural state. By the erection of a dam and raising the water above its natural level, and so maintaining it for twenty years adversely, a right would be acquired of flowing the lands on the margin of the pond to the height of such dam. It would be, however, a mere easement in those lands, and the fee would remain in the former owners.

Nothing beyond this would be acquired in respect to the original bed of the pond, whether it belonged to the State or individuals. The use is merely for the purpose of flowing the land ; and it is too well settled to need the citation of authorities, that such use is not inconsistent with the retention of the fee by the owner. In grants of mills and the appurtenances, the head of water, and the right of flowing the lands covered by it, will pass, but not the fee in the land so flowed, even if owned by the grantor. Washb. on Easements 33–35, and cases cited.

So far as respects the bed of the natural pond, the plaintiffs acquired the right to have it flowed by becoming the owners of the land at the outlet, and no one could interpose any objection to such use. This right, then, did not depend upon prescription, but was an incident of the land. For aught we can see, it stands upon the same ground as in the case of a running stream; and in neither case can we perceive any foundation for holding that, by the erection of a dam and the use of the natural flow of a stream, the absolute title to its bed would be acquired by any length of use. As to most of our large bodies of water, like Winnipiseogee lake, Squam lake, Newfound lake, Sunapee lake, and Massabesic lake, such dams have been erected at their outlets, and used for many years, but without supposing that a title in fee was thus acquired to the entire beds of those lakes; and we are well satisfied that no such position could be maintained.

The great question in the case is, how far the water power furnished by this pond in its present condition is to be considered in the valuation of the land owned by the company.

The right to maintain the dam and use the water flowing from the pond is an incident of the land at the outlet, and if used there it should unquestionably be included in the appraised value of the real estate; and it would make no difference whether the power was gained partly by artificial means, or was wholly the natural force of the stream. It does not appear from the case that the water is used at all at the outlet, but rather that the pond is used as a reservoir for the benefit of the plaintiffs' mills at Dover,—the water being drawn from the dam, and finding its way into the Cochecho river on which those mills are situate. If, beyond the use of the pond as such reservoir, there is a surplus which might be used profitably at the outlet, it clearly ought to be included in the valuation of the plaintiffs' real estate in Strafford, even if it be not actually used there, for it would add materially to the value

of the land; and we can see no reason for holding it not subject to taxation that would not apply equally to all real estate that is not brought into a productive state. If it really enhances the value of the land to which it belongs, it ought to be taxed like other real estate at its fair value.

Such is the doctrine of *Lowell* v. *Middlesex Co.*, 6 Allen 131. In that case, the Middlesex Company were the proprietors of locks and canals from which they supplied the various manufacturing companies in Lowell with water to propel their machinery; and it appeared that these companies used all the water which these works of the Middlesex Company could supply throughout the entire year,—but that for nine months in the year there was a considerable surplus of water capable of a profitable use, but not yet applied to manufacturing purposes. The water power used by the several companies was not taxed to them separately, but was included in the valuation of the mills.

The Middlesex Company was assessed in Lowell for the locks and canals and water power; and the court, on full consideration, held that the company was legally taxable for the locks and canals, and the surplus water power remaining after supplying the several mills, but not for the power furnished to those mills and for which they were taxed. Upon the same principle, the surplus water power not absorbed by its use as a reservoir would at least be taxable in Strafford.

It is a graver and more difficult question, whether the entire water power furnished by this pond shall be taxed as part of the real estate of the plaintiffs in Strafford.

By Gen. Stats., ch. 50, sec. 11, real estate shall be taxed in the town in which it is situate. That this water power is an incident of the land and is part of the real estate there can be no controversy ; but the question is, whether it is situate in the town of Strafford, within the meaning of the law, for the purpose of taxation. Had the mills been built in Strafford at this outlet, and the water used there, there could have been no question ; but the difficulty arises from the fact that the reservoir, so far as it is artificial, was created for the use of the mills at Dover, and is used for their benefit ; and it would seem to be probable that by far the greatest part of the value of the present water power arises from its increase by what may well be considered as artificial means, by which the water may be raised twelve feet above and drawn eight feet below its natural level, especially when it is quite probable that its value as a reservoir to be drawn from in dry times for the large mills at Dover may be much more than for any use that could be made of it at the outlet. At all events, this additional water power was created for use at Dover, is used there, and, by enhancing the valuation of the Dover mills, may in some sense be said to be taxed there. This raises the question, whether, by applying a water power to the use of mills in another town, it became so far annexed to those mills and a part of them as to be subject to taxation there to the exclusion of the town in which the water power was originally situate.

In *Boston Manf'g Čo.* v. *Newton*, 22 Pick. 22, the case was this: the plaintiffs owned two mill-dams across the Charles river, which divided the towns of Newton and Waltham, and the water power thus created was exclusively applied to drive mills on the Waltham side of the river; and the plaintiffs were taxed in Waltham for their mills. The town of Newton also taxed the plaintiffs for one half the dams and for the land in Newton, and for one half the water power. The court held that the water power not used is not a distinct subject of taxation; that it is a capacity of land for a certain mode of improvement, which cannot be taxed independently of the land—and more especially because the water power had been annexed to the mills and went to enhance their value, and could be taxed only with the mills as contributing to increase their value; and therefore, as the mills were situated in Waltham, no part of the water power could be taxed in Newton. There the water power originally belonged to the riparian owners in each town as tenants in common, and there was no obstacle to its being used on the Newton side of the river; but as the plaintiffs, owning both sides of the river, built their mills wholly on the Waltham side and used all the water there, the water power was regarded as annexed to those mills and made part of them, and was taxable in Waltham alone.

In this way a water power, originally attached to the land on both sides equally, was transferred wholly to one side.

The same principle might apply to a case where mills were erected below a reservoir like this, but over the line and in another town, and all the water furnished by the reservoir taken by a flume for the use of those mills.

This indeed would be changing the locality of this kind of property; but it is nevertheless one of the incidents of ownership, as is often seen in the removal of buildings from one town or ward of a city to another. In respect to rivers, it is very clear that the right to the use of the whole water power at a particular mill site may be acquired, by grant or prescription, by the riparian owner upon one side. This was assumed to be the law in *Burnham* v. *Kempton*, 44 N. H. 78.

In such a case, where the river was the boundary between two towns, it would seem to be reasonable that the water power should be taxable only in the town where there was a right to use it. It certainly could not be taxed to the riparian owner who had no right to its use; nor could the water power be taxed separately and independently of the land to which it was incident.

Whether the doctrine of the *Boston Manufacturing Company* v. *Newton* is sound, or whether it is applicable to the present case, remains to be seen,—and we give no opinion as to its soundness.

The dam and excavations at the outlet of this pond were made for the benefit of the mills at Dover; but still, as the water is not conducted in a flume to those mills, but is suffered to run in its natural channel, it may be that it can be profitably used to propel machinery at the outlet; and it may be, also, that all the water power that has

been gained by these artificial means can be profitably used there without affecting its usefulness at the Dover mills. This would depend much upon the quantity of water naturally flowing from the pond, and the character of the fall at the outlet. If the water can be so used at the outlet, it clearly ought to be included at its fair value in the valuation of the plaintiffs' property in Strafford. As before stated, the water that runs over the dam, or that is drawn from it for use at the Dover mills, passes down its accustomed channel, understood to be the Isinglass river, and runs into the Cochecho river, and then to the Dover mills, a distance in all of twenty miles. During the whole of its course before and after it unites with the Cochecho river, it forms a part of both rivers, and, for aught we can see, is subject to the ordinary use by the riparian owners for manufacturing or other purposes, and is, in fact, so used. It is not, then, applied to the exclusive use of the Dover mills, as it would be if conducted to them all the way by a flume ; it which case it might, perhaps, be deemed to come within the principle adopted in the *Boston Manufacturing Company* v. *Newton*, 22 Pick. 22, before cited.

And the question is, whether this water, running in an open and natural channel, and subject to use in the ordinary way by the riparian owners throughout its whole course, can be regarded as so far annexed to the Dover mills as to be taxable there only, as in case it was exclusively applied to the use of those mills by a flume the whole distance. Very little light is shed upon this question by the adjudged cases. Some aid may be obtained from the case of the *Talargoch Lead Mining Co.* v. *St. Asaph Union*, 3 Queen's Bench 478, decided in 1868. There, the company having obtained a lease of a corn mill at £100 per year, diverted the stream which supplied it into an artificial and new water-course of about a mile and a half in length, through which they drew so much of the water of the stream as was required for working a pumping engine and for other purposes of the mine, after providing sufficient for the inhabitants along the stream. The water-course was partly open and partly tunnelled, and for about three hundred and fifty yards next the mine the water was taken through iron pipes. The whole water-course and the corn mill were in the parish of Dyserth. The company owned some of the land in which the water-course was made, and paid an annual rent for the rest.

It was rated in this parish as land, water-course, land covered with water, way leases, land for laying water pipes on, and it was rated at £100, although the agricultural value of the land was only £2. The company contended that as this water-course was accessory to the mine, and as that was not ratable, the water-course itself was not liable to be taxed. It appeared, in fact, that the mine itself was not ratable, and that the water was used to work it ; but the court held that the land over which the water flowed was ratable, and for its increased value arising from its capabilities of carrying water to the mine. COCKBURN, C. J., says,—" We are dealing with a water-course passing over a considerable extent of land, and the works are only thus

connected with the mine ;" and he looks at it as a case where the value of the land is increased by the existence of the water-course.

BLACKBURN, J., says that it can never for a moment be said that this water-course is part of the mine. Its value is, no doubt, that it affords facilities to the occupation of the mine and the works attached to it, but the water-course is part of the soil, with its value enhanced if you can carry water.

It appeared that the company paid £100 per annum to the owner of the corn mill for the right to take the water to their mine ; but the court held that it would be wrong to rate the water-course in respect to the amount so paid.

The substance of this decision, so far as it has relation to the present case, is, that this land and water-course, although used for working the mine, were not a part of it, but liable to be rated separately. In making this decision, the court distinguished it from *Rex* v. *Bilston*, 5 B. & C. 851, where it was held that an engine used in working a mine, for raising water and other purposes, was not ratable. In this case of the *Talargoch Mining Co.* v. *St. Asaph Union*, the water-course which had been used to carry a corn mill was diverted wholly by the mining company, and, by means of a canal and pipes one mile and a half long, the water was applied wholly to working a pumping engine and for other purposes of the mine ; yet the court held that, for the purpose of taxation, the water-course was no part of the mine. Upon this principle, the reservoir in the case before us would not, for the purposes of taxation, be regarded as part of the Dover mills ; neither would a canal carrying water from the reservoir to those mills. That, indeed, would be like the case of *Talargoch Mining Co.* v. *St. Asaph Union*, which is strongly in point.

It is urged on the part of the plaintiffs that the water power furnished by this pond is appurtenant to the Dover mills, on the ground that a conveyance of the mills with the appurtenances would carry the water power. Granting that it would include the right to use the water as it was then being used, it would not convey the land to which the water power is still an incident, and not being disannexed, the whole is liable to be taxed in Strafford ; and the case of *Talargoch Mining Co.* v. *St. Asaph Union*, before cited, is in point. The creation of this reservoir has probably greatly increased the hydraulic power of both the Isinglass and Cochecho rivers, and thereby enhanced the value of all the mills on those streams, and for such increased value each of those mills is properly taxable ; and in this way the water power so gained may be taxed several times, and this because it is used several times over. The effect is substantially to enlarge the water power of these streams ; and the owners of all the mill sites on them have the same right to use them in their improved state, as they would have had to use the natural streams,—although they would not, probably, after this long use by the Cocheco Manufacturing Company, have a right to interfere with the customary mode of drawing the water from the reservoir. But for purposes of use by the riparian owners, and for taxation,

the water power of these streams, in their improved state, must, for aught we can see, stand relatively as it did before such improvement.

Upon a full and careful consideration of the case, we think that this reservoir cannot be regarded as annexed to the mills at Dover and taxable there only. Whatever might be our views in respect to a case like that of the *Boston Manufacturing Co.* v. *Newton*, we think the principle there announced cannot apply here, where the water power created is not appropriated exclusively by the Dover mills, but consists in increasing the hydraulic power of the two rivers for the space of twenty miles, in the advantages of which all the riparian owners have a right to participate. The land at the outlet, with the water power incident to it, was taxable, and was taxed as non-resident real estate in Strafford; and in assessing it, the assessors were not called upon to inquire into the state of the title, or by whom the right to regulate the flow of the water was possessed. The property was before them, and it was their duty to appraise it at its fair value, considering the various uses to which it might be applied, whether the improvement was made by a resident or a non-resident. In this respect it stood like any other real property upon which improvements were made.

To effect a change in the place of taxing this water power, there must be something more than a mere change of ownership, or in the use for which the improvement is made; there must be such a physical change as shall annex it to land in another town. Whether that can be done at all, and if so, how, we need not decide; but we are satisfied that such a state of things does not exist in this case.

It has been suggested that upon these views the water power furnished by this pond will be subject to double taxation, and even to be taxed many times over; and, undoubtedly, this is the most embarrassing aspect of the question before us, enhanced, as the embarrassment is, by the fact that the improvement of this water power was made by the Dover mills, and for use at those mills. So far as regards the other mills upon this water-course, there can be no difficulty. If the hydraulic power of these streams is increased by the improvements, then other mills have the same right to use it as they had to use the streams in their original state, but have no right to control the use of the reservoir as such. It is proper, then, that they should be taxed for the enhanced value of their mills, arising incidentally from this improvement, which has cost them nothing.

As to the Dover mills, they have acquired the right, by artificial means, to enlarge the capacity of this pond as a reservoir. In its original state it was valuable on account of that very capacity of improvement, and chiefly on that account; and what has been done in the erection of the dam and the excavations has simply enlarged its capacity as a reservoir, and enhanced its value. That value is found chiefly in the fact that it can be used to great advantage as a reservoir, and the right to control it and regulate the flow of the water is a great element of that value.

In taxing the intermediate mill owners, then, for the enhanced value

of their mills, it is obvious that a great element of value in the reservoir is not reached at all ; and, in respect to the Dover mills, they have merely enlarged, by artificial means, the capacity of this pond as a reservoir, but they have not changed its character, or removed it from the town of Strafford.   Before the improvement it was real estate in that town, and of a value much increased by the fact that it possessed this capacity of improvement; and the fact that it has been so improved, and its value enhanced, does not change its nature or locality.   In these respects it is the same, whether the improvement be made by a Strafford or a Dover corporation.   In respect to the Dover mills, it is not material whether the property be taxed in Strafford or in Dover, if it is only taxed reasonably ; and when it is understood that in appraising the Dover mills for taxation the cost of maintaining the advantages of the reservoir, including the taxes paid in Strafford, should be considered, no injustice to the Dover mills is likely to be done.

Before the improvements were made, the question would be, What was the fair salable value of this property in Strafford, considering the various uses to which it might be put ?—and the question would be the same since the improvements.

In regard to the taxation in Dover, it may be suggested, that in determining the valuation of the Dover mills for the purpose of taxation there, while this enhanced value caused by this reservoir should be considered, there should at the same time be considered the annual cost of maintaining and managing the reservoir, including the repairs of the dam, bulk-head, and water gates, the taxes on the reservoir property in Strafford, and all other expenses incident to the care and management thereof.   In this way the objection arising from the taxation of the mills at Dover would be greatly diminished, if not in fact wholly removed, inasmuch as the enhanced valuation caused by the reservoir would be diminished in proportion to the taxation in Strafford.   Our conclusion then is, that this water power, furnished by this pond in its improved state, must, with the land to which it is incident, be regarded as real estate situate in Strafford, and subject to be there taxed, without being affected by the circumstance that the mills of the plaintiffs, with the water power attached, may be taxed in Dover.

In an additional brief, it is urged in behalf of the petitioners that all the ratable estate of the corporation is to be taxed in Dover, wherever it may be situated, and it is contended that this is a fair implication from the provisions of the General Statutes ; and especially from section 8 of chapter 51, which requires the cashier, or other proper officers of every corporation, on application by any selectman, to furnish at the principal place of business of said corporation an account in writing, on oath if required, of all the ratable estate of such corporation, and a like account of all shares and deposits therein owned by any person resident, or corporation established out of the State, within four days after such application.

We think, however, that no such inference can be made from this provision.   In the law of July 1, 1825, the duty is imposed upon the

clerk, agent, or directors of every manufacturing corporation, to exhibit to the selectmen of the town in which such establishment is situated a just and true account of all its ratable estate ; and yet it is expressly provided in the same act, that all the ratable estate of such manufacturing corporation shall be taxed to the corporation " in the town or place wherein said ratable estate is situated."

In *Smith* v. *Burley*, 9 N. H. 428, the history of this law was given ; and it was held that under it the property of manufacturing corporations is taxable to the corporations in the town where the property is situated. The provisions of this law of 1825 are substantially reenacted in the act of July 7, 1827, Laws, ed. 1830, page 555, sec. 6. By the Revised Statutes, chapter 4, sec. 7, the cashier, treasurer, agent, or other principal officer of every bank, savings institution, insurance company, or other corporation, shall, on application by *any* selectman, furnish an account of all the ratable estate of the corporation, &c. At the same time, in chapter 40, section 7, it is provided that all real and personal property shall be taxed to the person claiming the same, or to the person who is in the possession and actual occupancy thereof, provided such person will consent to be taxed for the same ; but such real estate shall be taxed in the town in which it is situate. And in section 5 of the same chapter, it is provided that " taxable property of manufacturing corporations in this State, and property taxable to any other corporation, shall be taxed to such corporation by its corporate name, in the town or place in which it is situate, except in cases where other provision is made."

These same provisions are substantially reenacted in the General Statutes. Under the laws of 1825 and 1827, the clerk or agent was required to give such account to the selectmen of the town in which the manufacturing establishment was situate, and only to those selectmen ; and yet, by the express terms of the same act, such property was to be taxed in the towns where the property was situate,—excluding, of course, any such inference as the petitioners now urge.

By the Revised Statutes and the General Statutes, these corporations are required to furnish an account to *any* selectman, instead of the selectmen of the town where their business is located,—by which may fairly be understood, *any* selectman of *any* town having occasion to know about the property of the corporation for the purpose of taxation ; and this tends to rebut any inference that the property was to be taxed only in the town in which the corporation had its principal place of business. Besides, in both the Revised and General Statutes it is provided that all " real estate shall be taxed in the town in which it is situate."

And we think that the provision of the Revised Statutes, chapter 40, section 5, and General Statutes, chapter 50, section 8, that taxable property of corporations and property taxable to corporations shall be taxed to the corporation by its corporate name in the town in which it is located, except where other provision is made, is substantially a revision of the laws of 1825 and 1827, although extending it to other corporations.

To regard it as providing for the taxation of all property of a corpo-
ration in the town where the corporation is established, would be con-
trary to the long and well established policy of our tax laws, especially
as respects real estate.   This is shown by the well considered case of
the *Nashua Savings Bank* v. *The City of Nashua*, 46 N. H. 389, where
it was held, under the Revised Statutes, that real estate of a savings
bank is taxable in the town where it is situated.

We are clearly of the opinion, then, that the real estate of the peti-
tioners is taxable only in the town where it is located.

It is urged, also, that this corporation is not liable to be assessed for
its property until an application has been made for an account at its
principal place of business.   But we see nothing in the law that requires
the selectmen to make such application.   They may do it if the aid of the
corporation is deemed necessary ; and if the account is not furnished, the
corporation may be doomed, as in the case of individuals.   Nor is there
anything in the law that requires notice to the tax-payer that the select-
men are about to appraise his property.   Practically, no such thing is
done, and we do not think it necessary.

It is also urged that the valuation and assessment upon " land, dam,
and pond, known as the Bow pond reservoir, ranges 6 and 7, 1000 acres,
value $40,000," are void upon the ground, among other things, that three
distinct classes or items of property are taxed together at an entire
gross sum.

We cannot, however, so regard it.   The dam and water power are
incidents of the land, and really part of it ; and the mention of the
dam and pond must be regarded as merely descriptive, much the same as
if the terms had been the land, ranges 6 and 7, including the dam and
pond known as the Bow pond reservoir.   It is like a description of
land, as Black Acre and the buildings thereon, which could never be
understood as two distinct classes of property.   So it is much like the
case before cited of the *Talargoch Lead Mining Co.* v. *St. Asaph
Union*, where the property was rated as land, water-course, land cov-
ered with water, way leases, land for laying water pipes on, all rated
at £100.

It is also urged that the entire assessment was illegal and void, because
land was included in the appraisal and assessment that did not belong
to the petitioners.

From the answer, it would seem quite probable that the selectmen
did include in their estimate of value the land forming the original bed
of the pond, and perhaps land which the company had merely the right
to flow.   So far as this is the case the tax would seem to be illegal, and
in some other proceeding might affect the validity of the entire tax : of
that, however, we give no opinion.

But it is held in this State that this is an equitable proceeding, and
that, although the assessment may be illegal on account of imposing a
four-fold tax when the facts did not justify it, the court would abate
only the excess, and allow what was just to remain.   Such is the doc-
trine of *Perry's Petition*, 16 N. H. 44, and we see no reason to dissent

from it. It is very clear that this is largely an appeal to the discretion of the court, the same as to the selectmen, as in the case of poverty or insanity of the tax-payer, and so in the case of over-valuation of the property assessed ; and there the court should ascertain the true valuation of the property, and adjust the tax accordingly. The jurisdiction was conferred originally upon the court upon this ground, and to be so exercised; and the case of over-valuation, by including by mistake some property not subject to be assessed, stands much upon the same ground. The case made by the petition is substantially an over-estimate of the quantity of the land and the value of the property.

The remaining question is, whether an exhibition by the company to the selectmen of Strafford of their taxable estate was necessary to enable them to maintain this petition.

The General Statutes, ch. 53, sec. 11, provide that a tax-payer, having complied with the requirements of section 4 of chapter 52, may apply to the supreme judicial court to abate his tax when the selectmen refuse. The reference to chapter 52 is undoubtedly a mistake ; it should be chapter 51, section 4. Section 4 of chapter 52 makes no requirement of the tax-payer at all. Section 4 of chapter 51 requires that every person liable to be taxed in such town shall exhibit to the selectmen, at the time and place appointed by them, or upon such personal application, a true account of the polls and estate for which he is there taxable, and on oath if required. This is, with some merely verbal alterations, the same as section 4 of chapter 41 of the Revised Statutes ; and in chapter 44, section 2 of the Revised Statutes, which is retained in the General Statutes, chapter 53, section 11, without substantial change, the reference is to this section 4 of chapter 41,—leaving no room to doubt that the reference in the General Statutes should have been to chapter 51 instead of 52 ; and so we shall proceed to consider it. In the first place, a non-resident owner of land is entitled to this remedy—*Dewey* v. *Stratford*, 40 N. H. 203 ; but the question is, whether an exhibition of an account of the taxable estate was an essential prerequisite. The provision of section 4 of chapter 51 is, that " every person liable to be taxed in such town shall exhibit an account to the selectmen," &c. In the Revised Statutes the terms were, " all persons liable to be taxed in such town," &c. By the law of July 7, 1827, N. H. Laws, 1830, p. 553, the provision was, that the *inhabitants* of the several towns in this State shall annually exhibit to the selectmen a just and true account ; and the selectmen were required to give notice to the *inhabitants*, of the time and place in their towns when and where they will receive such account, by warning in a public meeting, by posting notices, or in some other way ; and an invoice shall be taken of what the respective inhabitants had on the first day of April. The law of February 8, 1791, ed. 1805, p. 214, was the same. It is clear, then, that by these laws of 1791 and 1827 none but inhabitants of the several towns were required to exhibit an account ; and the question is, whether, by the Revised Statutes, the legislature intended to change the law so as to require of non-residents an account. By the Revised Statutes, as

we have seen, all persons liable to be taxed in such town shall exhibit, &c. Strictly speaking, this language does not apply to a person who is not an inhabitant, for a non-resident is not liable to be taxed personally in the town for the lands he may own there. In *Dewey* v. *Strafford*, 42 N. H. 286, decided in 1860, it was held to be the intention of the legislature that taxes assessed upon the lands of non-residents should be a charge upon the lands taxed, only, and not a personal charge against the owner, and to be enforced only by a sale of the land. The same doctrine is held in Massachusetts. *Rising* v. *Granger*, 1 Mass. 47. So the general provision for taxing is, that every person shall be taxed in the town in which he is an inhabitant or resident, &c. General Statutes, ch. 50, sec. 1. And this is, as we think, in accordance with the universal practice in this State—the tax being assessed against the land, giving the name of the owner, if known; otherwise, the name of the original proprietor, if known; if not, by the number of the lot and range, and other description. So the provisions for the collection of such taxes exclude all idea of any personal liabilities on the part of the owner.

Clearly, then, such owner " is not liable to be taxed " for such lands, in the ordinary sense of those terms; and unless there is something in the nature of the case that points to a more enlarged construction of those terms, so as to include persons whose lands are liable to be taxed in the town, non-residents are not required to render an account. From 1791 to the passage of the Revised Statutes, they were clearly not required to exhibit an account; and, upon a careful examination of the legislation on that subject, we think there was no intention to change the old law.

Had there been such an intention, we should naturally have expected a more explicit expression of that intention; but the terms used in the later laws may fairly be construed to mean the same as the former statutes. The Revised Statutes and the General Statutes are but revisions of the former laws; and it is an established rule of construction, that unless there is found in the revision such a change of the language as to indicate a clear intention to change the law, the previous construction will be adopted—*Jewell* v. *Holderness*, 41 N. H. 163, and cases cited; and the construction will not be changed by alterations which are designed to render the provisions more concise. *Ibid*, and *Burnham* v. *Stevens*, 33 N. H. 256. In this case we perceive no such change in the language as to evince a purpose to change the law on this point.

In one respect there is some change by the Revised and General Statutes. By the old laws, the selectmen were required to make an invoice of what the respective inhabitants had on the first day of April, while in the Revised and General Statutes they were to take an invoice of all the polls and estate liable to be taxed; and yet, in the old law the provisions for taxing non-resident lands necessarily imply the taking an invoice, so that the change here is but in the form and not in the substance, and cannot affect the question before us. There are good reasons for not including non-residents in the obligation of inhabitants

to exhibit an account. In the first place, the notice provided is not likely to reach them; and then there is ordinarily no necessity for such an account, the land only being liable to be assessed, and no difficulty in ascertaining what and where it is.

It would not be unreasonable, therefore, to suppose that the legislature did not intend to require an account of non-residents. We think, then, that there has been no failure to comply with the provisions of section 4, chapter 51, of the General Statutes, because no account was required of non-residents. It may also be suggested, that the provisions for application for an account at the place of business of such corporations sustain the views we have announced.

*Case discharged.*

LADD, J., did not concur in all the views of the court as expressed in the foregoing opinion by the chief justice, but delivered no opinion.

DOE, J. I. Is Strafford real estate taxable in Strafford? "Real estate shall be taxed in the town in which it is situate." Gen. Stats., ch. 50, sec. 11. "The words 'land,' 'lands,' or 'real estate' shall include lands, tenements, and hereditaments, and all rights thereto and interests therein." Gen. Stats., ch. 1, sec. 20. The plaintiffs' real estate situate in Strafford is taxable there, and that real estate includes their land and dam, their rights of flowage and drainage, and all their rights to and interests in real estate in the town.

Topographically considered, the water power of this estate is the difference of level in the land over which the water runs; and that difference of level exists (so far as it can be said to have a local existence) in Strafford, where the land is, and not in Dover. The value of the basin of Bow pond, composed of land and dam (the dam being regarded by the law as land), consists partly in its height of outlet, which gives it a power of pouring out water from an elevation; partly in its form and size, which give it a capacity for holding water; partly in its situation, which enables it to receive a constant supply of water to be held and poured out. These capacities of the basin give it a value, as the capacities of the adjoining land for the growth of grass or wood give it a value. Whether a basin be real or personal estate, its value depends upon its capabilities. In such legal formalities as the annual invoice and the record of assessment, capacity is not a subject of taxation; but it is evidence of the substantial value of taxable property. The present value of the basin of Bow pond is not in the water which it now holds. The water, like the air above the water, passes away, and is not owned by the plaintiffs. It is the right to a reasonable use of those circulating elements which the basin may enable its owner to enjoy, and not the elements themselves to which the plaintiffs have a legal title. In point of law, the capacity of the basin for receiving, holding, and pouring out a constant supply of water, is a quality

of the land; and the land is situate in Strafford. In point of fact, the right of the plaintiffs to use the basin for receiving, holding, and pouring out water, is exercised by them in Strafford. They choose to exercise the right of pouring out the water, in the particulars of time and quantity, in a manner the most advantageous for their Dover mills. But their favorite method of exercising this part of their right in those particulars does not change either the locality of the Strafford land to which the right is incident, or the town in which the right is, and of necessity must be, exercised.

The legislature might have enacted that real estate shall be taxed in the town in which its owner lives or carries on business; or that such real estate as would pass by deed as appurtenant to other real estate shall be taxed in the town in which the latter is situate; or that real estate used as a reservoir or basin shall be taxed in the town or towns in which the owner, on the first day of April in each year, intends to apply to manufacturing purposes, during any portion of that year, any of the water which he intends to draw from the basin if his needs shall require him to draw any, and that, if the owner has no such intention, the basin shall be taxed in the town or towns in which it is situate. But the legislature have done nothing of the kind. Instead of prescribing an inconvenient and unsettled rule upon any such shifting and dubious circumstances, they have established a purely geographical test by declaring that "real estate shall be taxed in the town in which it is situate." Strafford real estate is taxable in Strafford; Dover real estate is taxable in Dover.

If a riparian owner of a water-course running through the towns A, B, and C, builds a dam across it in the town of C, and thereby flows his lands in A and B, he does not thereby repeal the act of the legislature which fixed the boundaries of the towns, nor does he thereby exercise the legislative power of enacting that any part of his real estate shall not be taxed in the town in which it is situate. His real estate in A would be taxable there, because the legislature have said,—"Real estate shall be taxed in the town in which it is situate." They might have said,—"Flowed land and the easement of flowage shall be taxed in the town in which the dam that causes ·the flowage is situate;" but they have not said so. So, if the riparian owner builds a dam in the town of A, and by a flume, natural or artificial, conducts the water to his wheel in B, he does not thereby alter the boundaries of the towns, nor change the locality of his land and easements situate in A, nor repeal the statute which fixes the place of their taxation in the town in which they are situate. Nor would the geographical lines of taxation be changed if the wheel in the town of B were used solely to operate machinery in the town of C. The legislature might have said that all dams, flowed lands, and reservoirs, or that certain aquatic rights, shall be taxed in the towns in which certain wheels are situate, or in the towns in which other machinery is situate, on the first day of April; but they have not said so.

If these plaintiffs should sell all their Strafford real estate to the

Newmarket Manufacturing Company, and that company, first acquiring the right so to do, should divert the water of Bow pond into the stream that turns their wheels, the Strafford real estate would remain taxable in the town of Strafford and county of Strafford, and would not be taxable in the town of Newmarket and county of Rockingham, for the simple reason that it would remain in the town of Strafford and would not be moved into Newmarket. But if the Newmarket company should carry the materials of the Strafford dam to Newmarket and annex them to their Newmarket land, those materials would be taxable in Newmarket, for the simple reason that they would be real estate situate in that town. The locality of the dam would be changed by its actual transportation, but not by the delivery of a deed or the diversion of water. If a Lowell manufacturing company should purchase all the plaintiffs' Strafford real estate, and, being duly authorized, should turn the outlet of Bow pond into the Suncook branch of the Merrimack river, and use the pond as a reservoir for the benefit of their Lowell mill, the taxation of the Strafford real estate would not be transferred to Massachusetts. But if the Lowell company should carry any part of the Strafford property to Lowell and annex it to their Lowell land, there would be the same difficulty in holding real estate situate in Lowell to be situate in Strafford, that there is in holding the materials of wood, stone, and clay, severed from New Hampshire land, transported to Lawrence, and used in building that city, to be still situate in New Hampshire.

If Strafford real estate can be disannexed from Strafford and annexed to Dover, for the purposes of taxation, by an order of the owner and a canal, without transportation, it can also be disannexed from Dover and annexed to Barrington, and then reännexed to Strafford, by other orders and the same canal. On this theory, property absolutely stationary in its geographical nature, might, while 'actually remaining in Strafford, acquire an ideal, itinerant character, and be found temporarily absent from that town and transiently located in such other town as the owner should from time to time designate, and sometimes scattered in undivided fractional parts, in several surrounding towns, at the ends of various canals running from Bow pond. Such a visionary migration of real estate is not a principle of the common law, and is as little in harmony with the terms and spirit of the statute and the convenience of taxation, as with the order of nature.

If there were no statute authorizing the taxation of manufacturing establishments, the question might be whether this Strafford estate is a part of the plaintiffs' manufacturing establishment—as, in *Talargoch Lead Mining Co.* v. *St. Asaph Union*, Law Rep., 3 Q. B. 478, the question was, whether a water-course, used in working' a mine which was not taxable, was a part of the mine. But the decision of a question of that kind has no bearing on this case. Here the question is, whether this real estate is situate in Stafford, not whether it is a part, incident, accessory, adjunct, or appurtenance of the plaintiffs' manufacturing establishment. If land could be appurtenant to land, as an incor-

poreal hereditament may be, and if the plaintiffs' Strafford estate, corporeal ·and incorporeal, were a mere Strafford appurtenance of the Dover mills, it would nevertheless be situate in Strafford.    Concerning the place of taxation, in this case, there is no question of law—nothing but a question of geography; and on that question the parties are agreed.

II.  At what sum ought the selectmen ·of Strafford to have appraised the property ?   " The selectmen shall appraise all taxable property at its full and true value in money."    Gen. Stats., ch. 52, sec. 1.*    The selectmen ought to have appraised this and all other property taxable in the town at its value ; and the question of value is as pure a question of fact as the geographical question of locality.    When a question of the value of real or personal property is tried by jury in a civil or criminal case according to the strict rules of law, the judge does not instruct the jury what the value is as a matter of law.    The judge rules upon the admissibility of the evidence offered, and the jury find the value proved by the evidence admitted by the judge.

The selectmen, in determining the value of this property, were not bound by the strict legal rules of evidence.    They might receive and weigh such evidence as they thought proper ; and ordinarily they would be as likely to arrive at a just appraisal by that course as by attempting to apply the technical rules of law to the admission of evidence.    And on a trial of the question of value before the commissioners now appointed by the court, the commissioners will have as much liberty as the selectmen.    The court would not refuse to act upon their appraisal merely because they did not attempt to apply the rules of the common law in the admission of evidence, or merely because, in attempting to apply them, they admitted what the court would have excluded, or excluded what the court would have admitted.    Their appraisal would not be rejected, like a verdict at common law, on a mere technicality, nor unless it were shown that there was some serious error practically and materially affecting the result arrived at.    They are not an independent tribunal, established by law for the final and conclusive appraisal of taxed property : the law puts upon the court alone the duty of doing justice in cases of this kind, and the court cannot transfer their responsibility to commissioners : the commissioners are employed by order of the court to ascertain a fact under the direction of the court, because this mode of ascertaining the fact is convenient for the parties : if the court think it probable, for any reason, that the fact is not correctly reported by the commissioners, they will act upon the fact, and not upon an inaccurate report of it ; but if the court see no reason to doubt the substantial correctness of the report, they will accept it as satisfactory proof of the fact without regard to tech-

---

* In July, 1872, the language of the General Statutes was amended by the addition of " as they would appraise the same in payment of a just debt from a solvent debtor."    Laws 1872, ch. 31.                    REPORTER..

nical niceties.   The commissioners should not report any of the evidence received or rejected by them, or any objections made by the parties to evidence, unless specially directed by the court so to do. Their appraisal, like that of the selectmen, might be founded entirely upon their own personal observation and knowledge, although they would of course hear any important evidence offered by the parties, unless they were sufficiently conversant with the value of such property in general or of this property in particular to appraise it correctly without the aid of the evidence offered.   This petition for the abatement of a tax is not a common law proceeding, and is subject, in the matter of evidence, not to the technical rules of the common law, but only to those rules of equity and good sense which are necessary to substantial justice.   The question of value being a question of fact, and the judgment of the commissioners being relied upon for the reception and rejection of evidence on that question, there is no question of law concerning the full and true value of the property which we are now called upon to decide.

III.  But suppose the court had seen fit to hamper the commissioners in this case with an order for a rigid application of the technical rules of evidence laid down in the books for the trial of questions of fact at common law, so that a trifling mistake in the application of those rules might annul the appraisal and indefinitely prolong this litigation ; or suppose, for any reason, it were advisable for the court now to anticipate what evidence may be offered, and to pass upon its technical competency,—what evidence would be admissible, under strict legal rules, upon the question of the full and true value in money of the plaintiffs' real estate situate in Strafford ?

Evidence tending to show the quantity of land of which the plaintiffs have the entire title, and the extent of their interest in other land, including their rights of flowage and drainage, would be competent. If there is a part of the natural pond which cannot be drained and converted to other uses at a reasonable expense, and if the plaintiffs have the right to the absolute control of it, it is probably immaterial whether they own the soil or not.   If the soil is valuable only as a basin for holding water, and if they have an unlimited right to use it for that purpose, it is probably not necessary, on this petition, to investigate the theoretical technicalities of the title.   If the plaintiffs have a right to use it as a basin, and if it is useless for any other purpose, their right is practically absolute, and that right and all their other rights in Strafford real estate, however acquired, should be appraised together in one sum at their value.

It would be proper for the commissioners to take a personal view of the premises, and of any other property and any other localities, so far as a view would throw any light on the value of the property in question, or help them to understand the other evidence, or aid them in any way in making a correct estimate.

The opinions of witnesses, qualified to judge of the value of the whole or any part of the property, would be competent evidence.   Gen.

Stats., ch. 209, sec. 24; *State* v. *Pike*, 49 N. H. 422.   Whether a witness is qualified to judge of the value, is a question of fact to be determined by the commissioners.   *Jones* v. *Tucker*, 41 N. H. 546; *Dole* v. *Johnson*, 50 N. H. 452; *Taylor* v. *R. W. Ins. Co.*, 51 N. H. 50.

Evidence tending to show what the property cost the plaintiffs, or any other former owner, would be competent.

Evidence of the price at which other property has been sold would be competent, if such other property can be so compared with any part of this as to have any tendency to show its value.   Whether any such comparison can be made is a question of fact for the commissioners to determine.

. If any part of the land owned by the plaintiffs can, with or without being drained, be used for raising wood or any annual crop, evidence tending to show its productive or salable value for such purposes would be admissible.   If the plaintiffs' right in any land is merely of flowage, evidence tending to show the agricultural value of such land would be admissible, because the price for which the plaintiffs can sell their easement might depend somewhat upon the sum which an agricultural owner of the soil would pay for the removal of the water.

If the plaintiffs can sell their Strafford estate to be used for the benefit of a Strafford mill situate at any point on the stream from the dam down to the line of Barrington, evidence tending to show the price it would bring for such use would be admissible.   If they can sell it to be used for the benefit of a Barrington mill situate farther down the stream, evidence tending to show the price it would bring for such use would be admissible.   If they can sell it with their Dover mills, to be used for the benefit of those mills situate still farther down the stream, evidence tending to show the joint price for which they can sell their Strafford and Dover estates together, and the part of that price fairly assignable to the Strafford estate, would be admissible.

If the plaintiffs had not the title or control of the Strafford reservoir, they would be entitled to the use of all the water that would naturally come to their Dover mills, subject to the reasonable use of other riparian owners above them.   If the reservoir did not exist, if the natural basin had not been created and no artificial alterations had been made, and the water were allowed to go to Dover without obstruction, the plaintiffs would have a right to the use of the natural stream at Dover, and to receive there as much water as they receive now,—and probably more, for the reservoir causes some loss by evaporation from its extended surface.   That right cannot be taxed in Strafford, because it is an incident of land situate in Dover.   But the advantage of the reservoir to the plaintiffs seems to be in its holding some of the water which they do not want in the wet season until they do want it in the dry season, not increasing the natural supply, but decreasing its irregularity.   And, whether the reservoir is worth more or less for the production of uniformity at its Strafford outlet, and consequently at Dover, than for the production of water power for sawing trees or grinding

corn at Strafford below the dam, or for the production of trees or corn above the dam, and whether there is or is not such an incompatibility in its various productive capacities that they cannot all be profitably exercised at one time, its capacity for producing crops, power, or uniformity, at any time and any place, is admissible evidence on the question of its value.

IV. Were the court to depart from its usual practice, and attempt to instruct the commissioners what weight they should give to the various kinds of evidence that may be offered and received, the instructions would involve no question of law, and would necessarily be very general and indefinite.

The first fact to be ascertained is, the full and true value in money, that is, the fair market value, of the plaintiffs' real estate in Strafford on the first day of April, 1870. Evidence of what it cost the plaintiffs or any other owner before that time, may be entitled to very little weight. It may have cost more or less than it was worth. In 1870 it might have been worth so much more or so much less than it had previously cost, that its previous cost would have very little, if any, tendency to show its value in 1870. Its previous and subsequent values, and all the rest of the facts proved, are material, so far as they tend to show the fair market value on the first day of April, 1870. It is not unlikely that much of the evidence, admissible under the technical rules of law, would be too remote and trivial to occupy much of the time of a competent board of commissioners in hearing or weighing it.

It may not be easy to ascertain the fair market value of the property as a Strafford mill privilege. Mill privileges may not be sold often enough to give them a market value as easily ascertained as the market value of a barrel of flour or an ordinary farm. The price of mill privileges, like the price of other property, depends upon the relation of demand and supply; and that relation may not be tested, in the case of mill privileges, frequently enough to establish such a uniform rate of prices as is attached to some other kinds of property. The evidence available on this point may not be very direct or satisfactory, but the law cannot supply a natural defect in the evidence.

If the value of the plaintiffs' Strafford estate depends, in a measure, on its being controlled for the benefit of their Dover estate, and if the value of the latter depends, in a measure, upon the control of the former, this mutual partial dependence of values is a circumstance to be considered in the appraisal of each of the estates, and to be carefully considered, so that no part of the fair market value of either shall be sacrificed for the undue advantage of the other. Such a mutual partial dependence of the values of the estates may create a difficulty, great or small, in the valuation of each; but such a difficulty, if it exists, is one of fact for which the law is not responsible, and which is to be solved, like other difficulties in questions of fact, upon diligent investigations, by candid, deliberate, and sound judgment. In making the investigation in this case, some general views of the subject may

perhaps be usefully borne in mind, although they may not of themselves lead to a precise arithmetical result.

A piece of real estate in two towns, A and B, might be so situated that the entire substantial value of each part would depend on its being jointly used with the other. If the selectmen of A should appraise the part situate in A at the value of both parts because the other part would be worthless for separate use, and if the selectmen of B should appraise the other part at the value of both parts because the part in A would be worthless for separate use, the error of disregarding their reciprocal relation would be obvious. There would be equal reason for the selectmen of A to appraise the part in A by the test of its being worthless without the other part, and for the selectmen of B to appraise the latter by the test of its being worthless without the former, thus appraising the whole at nothing.

If a Strafford farmer owned a tract of land containing one hundred equally productive acres, worth much more for pasturing cattle than for any other use; and a corner of it, containing one acre, were in Barnstead, and the rest in Strafford; and a brook on the Barnstead corner furnished the only supply of water for the cattle, and had no value for any other use,—the owner would be taxed in Barnstead for the one acre, and in Strafford for the rest; and the selectmen of each town, in appraising his property, would find a mutual partial dependence of values. If the selectmen of Barnstead should argue that the Barnstead acre was worth what the owner would give rather than lose it—that the ninety-nine acres would be nearly worthless, and could not be sold for a pasture without the brook, and that therefore nearly the whole value of the pasture was in the Barnstead acre; and if the Strafford selectmen should argue that the ninety-nine acres were worth what the owner would give rather than lose them—that the Barnstead acre would be nearly worthless and could not be sold separately for a pasture, and that therefore nearly the whole value of the pasture was in the ninety-nine acres,—the owner would probably find his pasture appraised and taxed far beyond its value. Whether he were or were not able to point out the logical flaw in the arguments of the selectmen, he would have a realizing sense of the unfairness of their conclusions; and his tax in each town would be abated by the court on another appraisal that would make the values of the parts no greater than the value of the whole. The value of the ninety-nine acres would certainly be greater if the cattle pasturing there could get water at the brook, than if they could not; and the value of the one acre would certainly be greater if there were ninety-nine adjoining acres in need of the water, than if there were not. But if a separate appraisal of either were founded upon the dependence of the other, and the mutuality of the dependence and the joint value were disregarded, the result would be as unsound as the calculation that if A owns a farm and owes B $500, and B owns a farm and owes A $10, each of them is worth the value of his farm and what the other owes him, without regard to the mutual debts.

The Dover mills do not depend on Bow pond for water or for power.

They would have as much water and as much power without the reservoir as with it. But if the reservoir can be useful as an instrument for lessening the natural irregularity of the water, its capacity for being used as a gauge or regulator is evidence entitled to some weight on the question of its value, for the same reason that, on the question of the value of the instrument called in mechanics a governor, its capacity for regulating and equalizing the speed of the machine to which it can be attached would be entitled to consideration. But if, for the purpose of taxation, such a regulator were appraised at a value increased by adding to it the value which the machine would lose by being deprived of a regulator ; and if the machine were appraised at a value increased by adding to it the value which the regulator would lose by being deprived of a machine to be regulated,—the regulator and the machine would be worth much more for the purpose of taxation than for any other purpose—a result too irrational to require any comment.

Nothing can be more fallacious than the idea that the amount which the owner of a piece of property would give rather than be deprived of it, is an absolute and conclusive test of its fair market value. What would the owner of a new house give rather than be deprived of the few feet of ground on which his chimney stands ? And who would think of making such an inquiry for the purpose of ascertaining the fair market value of that piece of ground ? Appraise every foot of a house-lot or farm on that principle, and the parts would be made of far greater value than the whole. The defect in the principle is, that it sacrifices a portion of the value of each part to increase the value of each. What is added to each in turn, is first taken from the others; and when the counteracting process of diminution and magnification is completed, the fictitious loss and the fictitious gain are equal, and the real value of the whole is no greater and no less than before. It might be argued that the house-owner might sell his land under his chimney at auction for a price enhanced by the fact that many persons, to whom the use of it would be valueless, would bid for it, knowing that the buyer could give the house-owner the choice of buying it back at an exorbitant price, or sacrificing a considerable part of the value of his house to the necessity of removal. In the practical business of life men would not stop long to consider such an argument, or to hear debate upon the question whether such a market price would be a fair market price. A board of selectmen, who should once appraise the property of a majority of their townsmen at the speculative value of property supposed to be taken from its owner and sold at auction as a means of extorting from him an unconscionable ransom for not injuring the value of his other property, would probably not be employed to exhibit that system of taxation a second time.

When it is said, as it sometimes is, that the value of property is what it is worth to the owner, this test of the value is not to be understood to be the cost of restoring the property if it were so changed as to be, figuratively speaking, destroyed ; but the test is to be understood

to be the fair market value, that is, what the owner could have sold the property for at a fair sale, at the time it was destroyed. *Jones* v. *Gooday*, 8. M. & W. 146. The owner may sometimes be entitled to greater damages for the destruction or conversion of property than its market value; he may be entitled to damages for the consequential injury to other property, or to his feelings, for interruption of business, or loss of comfort or health. But in this case of taxation the property is to be appraised at its fair market value.

While the law does not and cannot prescribe the weight to be given to the evidence bearing on a question of fact, it does not tolerate wild, erratic, fanciful, or distorted views. It can lay down no absolute rule for ascertaining what property is worth, because that is a question of fact; but it requires that question to be decided by a fair exercise of the common sense of an honest an intelligent man.

When we want to know what any piece of property is worth, for the purpose of taxation, or setting off a homestead, or dividing an estate among heirs, or making partition among tenants in common, or not attaching personal property exempt from attachment, or levying an execution on real estate, or imposing the penalty of larceny, the nature of the inquiry is not altered by an accumulation or omission of definitive adjectives and explanatory terms descriptive of the value to be ascertained. The constitution formerly required that a member of the house of representatives should have an estate " of the value of one hundred pounds ; " that a senator should have a freehold estate " of the value of two hundred pounds ;" that a governor should have an estate " of the value of five hundred pounds." Articles. 14, 29, 42. The act of February 8, 1791, provided that, for the purposes of taxation, certain real estate should " be estimated at the rate of half of one per cent. of the real value thereof." " The selectmen shall appraise all taxable property at its full and true value in money." Gen. Stats., ch. 52, sec. 1. The homestead right " shall not exceed in value five hundred dollars." *Id.*, ch. 124, sec. 1. In levying an execution, the appraisers appointed to set off the homestead " shall set off such homestead by metes and bounds, of the value of five hundred dollars and no more." *Id.*, sec. 7. When the homestead cannot be set off by division of the property without injury, the appraisers " shall appraise the whole." *Id.*, sec. 10. If real estate cannot be divided among heirs or devisees without great prejudice, the committee " shall appraise the same at its just value." *Id.*, ch. 185, sec. 5. The reversion of the widow's dower, and of the family homestead, may be set off " at its just value, to be estimated by the committee." *Id.*, sec. 10. Among the articles exempted from attachment are the debtor's " household furniture to the value of twenty dollars," " tools of his occupation to the value of fifty dollars," " provisions and fuel to the value of twenty dollars." *Id.*, ch. 205, sec. 2. " All real estate, except the homestead right, may be taken on execution, and shall be appraised and set off to the creditor at its just value." *Id.*, ch. 218, sec. 1. When partition cannot be made of real estate without great

prejudice or inconvenience, it may be assigned to one of the owners, he paying to the others " such sum of money as the committee shall award." *Id.*, ch. 228, sec. 25. If any person steals property " of the value of twenty dollars," or " of the value of ten dollars and less than twenty dollars," or " of a less amount or value than ten dollars," he is liable to a proportional penalty. *Id.*, ch. 260, secs. 3, 4, 5.

These instances are sufficient to show that when property is to be appraised at what it is worth, the use of terms descriptive of value is unnecessary. The value need not be required to be the real, full, true, just, fair, salable, market value in money, no more and no less. No one would suppose that the value is to be an unreal, partial, false, unjust, unfair, unsalable, or unmarketable value, or in anything else than money, or more or less than the property is worth, unless a departure from the usual course of business and the ordinary meaning of value were marked out by the law in an unmistakable manner.

" The selectmen shall appraise all taxable property at its full and true value in money." The words " full and true " " in money," give the statute no meaning which it would not have without them. As words of description, they are superfluous. They are mere words of emphasis, and not of necessary definition. And if the words " at its full and true value in money" had been omitted, the statute would have meant precisely what it means now. An appraisal of property signifies a valuation of it, or an estimation of its value, unless some other sense is plainly indicated. The common practice of undervaluing real estate for the purposes of taxation may have led the legislature to employ an unusual number of synonymous words, not to convey their meaning, but to impress it upon selectmen. Whatever the object of the tautology, it does not modify the legal or the natural interpretation of the word " appraise." If the legislature had said,—" The selectmen shall appraise all taxable property," and stopped there, it would be the duty of the selectmen to appraise all taxable property at what it is worth ; and that duty is emphasized, not changed, by the other words of the statute.

V. The statute provides that when a tax-payer properly applies by petition for an abatement of a tax, the court " shall make such order thereon as justice requires." Gen. Stats., ch. 53, sec. 11. Justice requires an equal rate of taxation of Strafford real estate. If the Strafford real estate of others was appraised, in 1870, at a less rate than its full value, the real estate of the plaintiffs should be appraised by the commissioners at the same rate, so that the plaintiffs shall pay their proportion of tax and no more. The usual rate in farming towns is well understood ; and the practice of under-valuation is so universal as to raise a presumption of fact that it prevails in Strafford. When the commissioners have ascertained the fact of the full value of the plaintiffs' Strafford real estate, on the first day of April, 1870, they should proceed further, and appraise it at its value as compared with the value at which other Strafford real estate was appraised by the selectmen in 1870. This comparative value is the only question which the commissioners are appointed to decide, and is a pure question of fact.